[No. 2040.]

ROBERT J. JOHNSON *v.* THE STATE.

INCEST — CHARGE OF THE COURT.— RELATIONSHIP BY AFFINITY ceases with the dissolution of the marriage creating it. Incest, therefore, between parties whose relationship is one of affinity founded merely upon the marriage of one of them, is impossible after the dissolution of the marriage; and therefore the trial court erred in charging that incest between step-father and step-daughter could be committed after the death of the step-daughter's mother.

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

The conviction in this case was had upon an indictment which charged the appellant with incest with one Kinnie Johnson, *alias* Kinnie Smith, the daughter of his wife, Ellen Johnson, in Gonzales county, Texas, on the 1st day of April, 1885. A term of five years in the penitentiary was the penalty imposed upon the appellant.

Kinnie Johnson was the first witness for the State. She testified that she was the daughter of Ellen Johnson, who died on the 26th day of February, 1884. The said Ellen was married to the defendant in 1872, when the witness, who was born in November, 1870, was in the second year of her age. The defendant lived with the said Ellen as her lawful husband, in Gonzales county, Texas, from the date of their said marriage until the death of the said Ellen. The witness lived with her mother and step-father from the time of their marriage in 1872 until the death of her mother in 1884, and since that time, until the defendant's arrest upon this charge, she continued to reside with him and his family near the town of Waelder, in Gonzales county. One day, several weeks after the death of the witness's mother, the defendant proposed to the witness that, as she and he were in fact not related, the witness should live with him as his wife. Witness in reply told defendant to go away and let her alone. On that same night the defendant came to the bed occupied by the witness and her half-sister, in a room separate from other members of the family. When he reached the bed occupied by witness, he told witness that he wanted her to let· him have his way with her. Witness refused, began to weep, left her bed and went into the room occupied by her half-brothers, and got into bed behind her brothers. Defendant followed the witness into that room, and made her leave the bed of her brothers where she had sought refuge, and go back to her own room, and to her own bed

with her half-sister. He then got into the bed with witness and her half-sister, and compelled witness to submit to his passion. He then had carnal intercourse with witness for the first time, penetrating her private parts with his male member. This was in Gonzales county, in the spring of 1884. The witness used her utmost endeavors to prevent the defendant from having carnal intercourse with her, but failed. When he finished, defendant told the witness that if she ever told any one about the affair he would cut the witness's throat. On the very next morning the witness told Annie Russell of the treatment to which she had been subjected by the defendant. Annie Russell had lived at defendant's house, as housekeeper, ever since the death of the witness's mother. Having told Annie of what the defendant had done, witness asked her what she should do about it. Annie replied that she could not advise the witness in the premises. The defendant often afterwards came to witness's room, and made her submit to his carnal appetite.

In the fall of 1884, the defendant married a woman named Emmeline, after which for some time he did not molest the witness, but eventually resumed his criminal association with the witness, compelling her to submit. In September, 1885, defendant took witness, her half-sister and two half-brothers, to the old Glen place to pick cotton. The Glen place was two or three miles distant from defendant's house, and the defendant's party always took their dinner with them. Other parties, including Jim Smith and John Hill, were picking cotton at the same place. At noon the defendant would take the dinner of his party from the cotton house, where the other pickers customarily ate dinner, and go to a thicket on a creek at the far edge of the field, requiring the members of his family to go with him. The defendant, after eating dinner, would send witness's half-sister back to the well near the cotton house for water, and her two half-brothers off to water the horses, and during their absence would compel witness to submit to his carnal embraces. This frequently occurred while the family were engaged picking cotton. The witness never, on any occasion, submitted willingly to the defendant, but was always coerced. After the defendant's marriage to Emmeline, and after he recommenced his outrages upon witness, witness went to Emmeline and told her all that had happened in the past, and all that was then being done by defendant, and told Emmeline how she could proceed to detect the defendant. At the time of his arrest, the defendant had witness's trunk packed and his horse hitched to his buggy, ready to take the witness off somewhere. Witness did not know where he designed taking her.

Cross-examined, the witness stated that she did not know who her father was, but had been told that he was a white man. Witness was two or three years old when her mother married the defendant. The witness said: "I did not get up out of my bed the first time my step-father came to my bed. He would not let me. Yes, I did get up; I got up and went through Annie Russell's room into my two brothers's room on the other side, and got into bed behind them. I did not wake them up. The defendant came into that room, took me out of the bed, and made me go back through Annie Russell's room into my room and get into bed. I again got out of bed and went into Annie Russell's room and stood by her bed. I did not try to awaken her. I stood there and cried. The defendant then came into Annie Russell's room, and took hold of my hand and made me go back into my room and get into my bed, when he also got in and had sexual intercourse with me. During the time he was having intercourse with me, I pinched my little sister to wake her up. When the defendant got through with me, he went back into his room through Annie Russell's room. When he would visit my room he would always come and go through Annie Russell's room. During all of this time we lived in the town of Waelder." The witness stated that she knew Judge Walker, who was the justice of the peace of the Waelder precinct, but never said anything to him about the treatment she was receiving at the hands of the defendant. She never mentioned the facts to any person other than Annie Russell and Emmeline. Witness was not acquainted with Tom Montgomery or Willie Cassada. She knew that some Mexicans lived near defendant, but she had never even known their names. The witness stated upon the examining trial, in October, 1885, that she did not know whether or not she was pregnant. She expected now to be confined in March, 1886. The witness often told Annie Russell and Emmeline what the defendant had done and was then periodically doing to her. The witness screamed and hallooed on the occasion of the defendant's first act of copulation with her.

Annie Russell was the next witness for the State. She testified that she went to the defendant's house on the second day after the death of his wife to take charge of his household, and had been living there ever since. The defendant's house comprises five rooms, including the kitchen. The defendant occupied the front room, the witness the next one, and Kinnie, the prosecuting witness, another room, which was separated from the room occupied by the boys by the room occupied by the witness. There was

no door-shutter in the doorway between the rooms of the witness and Kinnie, and any one passing from defendant's to Kinnie's room would have to go through the witness's room. The witness could not hear well at any distance, and generally slept very hard after midnight. Before the hour of midnight her sleep was generally very light. Some time during the year 1885 Kinnie came to witness's room and told witness that the defendant had solicited carnal favors of her on that day, but that he made no effort to obtain carnal connection with her. She asked witness's advice as to what she should do and witness declined to advise her.

Cross-examined, the witness stated that Kinnie never spoke to her but once about the defendant making improper overtures to her, and never told her that the defendant had ever had sexual intercourse with her. The one time that Kinnie told her of the defendant's proposal to copulate with her was long after the defendant's marriage to the woman Emmeline. She said then that the proposal was made in the day-time, and that the defendant did not then molest her. The witness could hear very well at close quarters,—from one room to another, for instance,—and thought that although she slept very soundly after midnight, she could have heard loud screaming from Kinnie's room, if such screaming had ever occurred, Kinnie's and her rooms being separated only by a thin partition and an open doorway. Witness had never heard any disturbance of any kind in Kinnie's room, and had never seen the defendant going through her room to or from Kinnie's after night.

W. D. Newton was the next witness for the State. He testified that he had been a school-teacher at Waelder more than twelve months, during the larger part of which time he boarded at the house of the defendant, occupying the room adjoining Kinnie's, the two rooms being separated by a thin partition. Some time during the last spring (1885), late at night, the witness heard a rumbling noise of some kind in Kinnie's room. He pulled the cover from his head to hear better, and thought he could detect the sounds of stealthy footsteps passing out of Kinnie's and going towards the room of the defendant. He then thought he heard the person making the sound of footsteps get into the bed occupied by the defendant and his wife. No one but the defendant and his wife Emmeline occupied the room last referred to. The witness could not say whose were the footsteps he heard, or whether they were the footsteps of a male or female. Kinnie's little sister slept with her.

Jim Smith testified, for the State, that in September, 1885, the defendant with Kinnie, his little daughter and two sons spent about

three weeks picking cotton on the old Glen place near Waelder. Others, including the witness and John Hill, were engaged in picking cotton on the same place at the time. The several parties were picking cotton for John Hill's father. All of the pickers, except the defendant and his family, always dined and nooned at the cotton house near a well in the field. Defendant and his family always, until the last week of his service, took his family to the woods on the creek, at the far end of the field, to noon and eat dinner. He almost invariably sent his smallest daughter back to the well for water, and his sons off to water the horses. Kinnie always went from the field at noon with the defendant, and always returned with him. She was never sent to the well for water. Defendant usually took two hours at his camp at noon.

Cross-examined, witness said that the defendant had a wagon and camp at the place in the woods to which he took his family to noon. His camp was no farther from the cotton house than other points in the field where others of the pickers worked. At the end of his first two weeks at work on the Glen place, the defendant took his wagon home, and during the remaining week of his work he and his family took their noon meals with the other pickers at the cotton house. Witness testified on the examining trial that he could detect pregnancy in a woman when she was only three weeks "gone," and that he could do so by a mere casual glance at her hips and while she was full robed. He knew from the appearance of her hips that Kinnie was pregnant when she was picking cotton on the Glen place in September, 1885.

John Hill testified, for the State, substantially as did Jim Smith, except that he said nothing about Kinnie's pregnancy in 1885. On his cross-examination he said that he heard no complaint from Kinnie during the time she was at work on the Glen place, and was camped in the woods. One day he found Kinnie crying, and asked her what was the matter, but she refused to tell him. He once saw the defendant whip Kinnie while they were picking cotton. When defendant first came to the place to pick cotton he asked permission to camp at the cotton house, but witness's father, who was running the farm, refused, because the house contained cotton.

The legal marriage of the defendant and the mother of Kinnie was admitted by the defense, and the State closed.

Emmeline Johnson testified, for the defense, that she and the defendant were married in December, 1884, when she went to the defendant's house to live. The defendant's household then comprised his two sons, a young daughter, the prosecuting witness, Kin-

nie, and Annie Russell, the housekeeper.   Kinnie never, at any time, told witness that her step-father, the defendant, had subjected her to his carnal processes.   She never, at any time, told witness how to proceed to detect defendant in carnal cohabitation with her.   On the contrary, Kinnie denied positively that she had ever had carnal acquaintance with anybody.   On the Friday before the Monday on which defendant was arrested, Kinnie's pregnancy became so apparent that witness called her up and told her that she had been obliging the men and was pregnant.   Kinnie positively denied that she had ever carnally known any man.   Witness assured her that such a denial in the presence of her physical condition was out of the question, and then for the first time Kinnie told witness that defendant had been having intercourse with her and had put her in a family way.

Cross-examined, the witness stated that some time in May, 1885, the prosecuting witness, Kinnie, did say something to her about defendant proposing carnal relations to her, but she said at the same time that such relations had never been entered upon between them. One night, some time afterwards, the witness was awakened by the little girl talking in her sleep.   Witness got up and went into the room occupied by the little girl and Kinnie, to see what was the matter.   Witness found her husband, the defendant, standing in the room near the door.   He told witness that he had gone into the room to see what was the matter with his little daughter.   Kinnie then appeared to be asleep, and, on the next morning, said that she was asleep and knew nothing about witness or defendant being in the room.   Witness whipped Kinnie on that morning.

The motion for new trial raised the question discussed in the opinion.

*Ponton & Fly,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Willson, Judge.   It is conclusively shown by the evidence that no act of carnal intercourse between the defendant and the prosecutrix, Kinnie, occurred prior to the death of Kinnie's mother.   In his charge to the jury the learned judge, in substance, instructed that carnal intercourse between defendant and Kinnie would be incest although such intercourse did not occur until *after* the death of said Kinnie's mother.

We are of the opinion that this view of the law is incorrect.

During the existence of the marriage relation between defendant and Kinnie's mother carnal intercourse between defendant and Kinnie would unquestionably have been incestuous. Kinnie was then his wife's daughter. But after the death of the mother and wife, the relation of step-father and step-daughter which existed between defendant and Kinnie ceased. She was no longer his wife's daughter, within the meaning of the statute defining the crime of incest. A divorce between the defendant and his wife would likewise have put an end to his relation to Kinnie. (*Compton* v. *The State*, 13 Texas Ct. App., 271; *Noble* v. *The State*, 22 Ohio St., 541; *S. C.*, 1 Green's Cr. Rep., 662.) Relationship by affinity ceases with the dissolution of the marriage creating it. (1 Bish. Mar. & Div., § 314; 1 Bish. Cr. Proc., § 901.)

If our view of the law be correct, and we are satisfied that it is, the defendant is not guilty of the crime of incest, and the court erred in so instructing the jury as to allow them to find him guilty, the evidence showing that, if he had carnal intercourse with Kinnie, it was not until after her relationship to him of step-daughter had ceased to exist. Under the facts of the case, he may be guilty of fornication and of adultery, and perhaps of rape, but not of incest.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*